**In re Mary BRIGANCE,**

**In re Kisha Lavae BROWN,**

**In re Adam B. CHANDLER,**

**In re Joy Zella ECHOLS, Debtors.**

**Bankruptcy Nos. 97–32566–L, 97–30834–L, 97–31345–L, 97–32181–L.**

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

March 13, 1998.

---

William M. Gotten, Memphis, TN, for Mary Brigance.

Brian W. Lynn, Germantown, TN, for Kisha Lavae Brown.

Melinda Benham, Memphis, TN, for Adam B. Chandler.

Sidney Feuerstein, Memphis, TN, for Joy Zella Echols.

George W. Stevenson, Memphis, TN, Chapter 13 Trustee.

Holly Schumpert, Memphis, TN, for EZ Cash 1, LLC.

F. Michael Bursi, Memphis, TN, for Cash in a Flash.

## MEMORANDUM OPINION

JENNIE D. LATTA, Bankruptcy Judge.

In each of these cases, the debtor used a deferred presentment service provider[1] to obtain a cash advance in exchange for a personal check. In each case, a bankruptcy petition was filed before the cash advance was repaid by the debtor, and in each of these cases, the debtor and the creditor submitted to the court for entry a proposed consent order creating a special class for the treatment of the claim of the deferred presentment service provider. The court was unable to determine from the information provided in the proposed consent orders whether approval of the proposed settlement was appropriate and thus set the matters for hearing. Because these cases raise common patterns of fact and common issues of law, consolidated hearings were held on January 21, 28, and February 13, 1998.

1. "Deferred presentment services" means a transaction pursuant to a written agreement involving the following combination of activities in exchange for a fee:
    (A) Accepting a check dated on the date it was written; and

## FACTS

### A. Mary Brigance

The parties stipulated to the following facts: Mary Brigance delivered her personal check in the amount of $248.00 to EZ Cash 1, LLC on August 9, 1997. In return, she received a check from EZ cash in the amount of $200.00. She signed a written agreement on August 9, 1997, that provided as follows:

### EZ CASH

### PAYROLL ADVANCE

### CUSTOMER AGREEMENT CONTRACT

I UNDERSTAND THAT CHECK NUMBER 293, DRAWN ON MY PERSONAL CHECKING ACCOUNT, WILL BE DUE ON 8–23–97. I UNDERSTAND THAT I MUST PICK UP MY CHECK BY THIS DUE DATE. I UNDERSTAND THAT I HAVE THE OPTION TO RENEW MY CONTRACT BY PAYING THE RENEWAL FEE BY THIS DUE DATE. FURTHERMORE, I UNDERSTAND THAT I CAN RECEIVE A DISCOUNT IF CONTRACT IS PAID OR RENEWED BEFORE MY DUE DATE.

IF THE FUNDS ARE NOT IN MY PERSONAL CHECKING ACCOUNT ON THE DUE DATE, A $20.00 N.S.F. CHARGE AND THE FOLLOWING ACTIONS AND PENALTIES WILL TAKE PLACE.

UNDER THE LAW OF THE STATE OF TENNESSEE, IT IS A **CRIMINAL ACT** TO ISSUE A WORTHLESS CHECK. I UNDERSTAND THAT I CANNOT STOP PAYMENT, WITHDRAW THE FUNDS OR CLOSE THE ACCOUNT TO PREVENT COLLECTION.

EZ CASH HAS THE RIGHT TO SEEK TREBLE DAMAGES **(THREE TIMES THE AMOUNT OF THE CHECK)** IF THE CHECK IS NOT GOOD. **I UNDERSTAND EZ CASH CAN SEEK COL-**

    (B) Holding a check for a period of time prior to presentment for payment or deposit.
TENN. CODE ANN. § 45–17–102(4).

LECTION THROUGH THE LEGAL SYSTEM INCLUDING THE ISSUANCE OF A CRIMINAL WARRANT IF THE CHECK IS NOT GOOD. FURTHERMORE, I AUTHORIZE EZ CASH TO UTILIZE OTHER COLLECTION SYSTEMS INCLUDING MERCHANT NOTIFICATION.[2]

Brigance Trial Exhibit 1.

Ms. Brigance did not redeem her check on August 23, 1997. Ms. Brigance filed a voluntary petition under Chapter 13 of the Bankruptcy Code on August 28, 1997. EZ Cash did not present the Brigance check for payment prior to the filing of her petition. EZ Cash filed a proof of claim in the amount of $298.00. Ms. Brigance did not appear at the scheduled hearing to consider the proposed classification and treatment of the claim of EZ Cash but was represented by Holly Schumpert, attorney. EZ Cash was represented by William M. Gotten, attorney. Melinda Thompson testified on behalf of EZ Cash.

The plan filed with Ms. Brigance's petition treated the claim of EZ Cash as a general unsecured claim to be repaid a percentage of its claim as determined by the Chapter 13 trustee upon the expiration of the 90 day bar date for filing proofs of claim. EZ Cash filed an objection to confirmation of the Brigance plan on the basis that its claim was secured and the debtor's plan proposed to pay less than the allowed amount of the claim. Ms. Schumpert and Mr. Gotten submitted to the court a proposed "Agreed Order Modifying Plan Before Confirmation and Withdrawing Objection of EZ Cash 1, LLC," on or about November 20, 1997, in which the parties sought to modify the debtor's plan "to reflect that because the debtor made this debt within 45 days of the filing of her Voluntary Petition, the claim of EZ Cash 1, LLC should be classified as a Class 1 unsecured to receive $20.00 per month on its claim of $298.00 which includes an attorney fee of $50.00. . . ."

**B. Kisha Lavae Brown**

Kisha Lavae Brown did not appear at the scheduled hearing but was represented by Brian W. Lynn, attorney. Ms. Brown obtained deferred presentment services from Cash in a Flash, which appeared by its attorney, F. Michael Bursi. Dwight Blake, Elaine Blake, and Patricia Clark testified on behalf of Cash in a Flash. Ms. Clark is the Collection Manager for Cash in a Flash. She testified that Ms. Brown held accounts at two Cash in a Flash stores. Her first transaction with Cash in a Flash occurred on April 11, 1997. She last issued two checks payable to Cash in a Flash on July 5, 1997, one in the amount of $238.00 and the other in the amount of $207.00. According to Ms. Clark, Ms. Brown's accounts were handled satisfactorily from April to July, 1997. On May 10, 1997, Ms. Brown signed a document which provides as follows:

**CASH IN A FLASH CHECK ADVANCE, L.L.C.**

**1791 FRAYSER BLVD.**

**MEMPHIS, TENNESSEE 38127**

358–4646

**TERMS AND CONDITIONS**

The customer agrees to be bound by the laws of the States of Tennessee and specifically at the time is presented, if it is dishonored, agrees to be bound by the Tenn.Code Ann. 47–29–101.

The consideration for these terms and conditions is the agreement of Cash in a Flash Check Advance not to present this check to a financial institution for payment until 14 days after the date of the check.

These terms and conditions constitute the entire agreement of the parties. The parties hereto have read these terms and conditions before signing and agree that no verbal statement, remark, agreement, or understanding oral or written not con-

---

**2.** Pursuant to TENN. CODE ANN. § 45–17–112(i) of the Deferred Presentment Services Act, which only became effective on October 1, 1997, if a check is returned to the deferred presentment service provider due to insufficient funds, closed account or a stop payment order, the deferred presentment service provider may pursue any civil actions it may have; however, it may not pursue a criminal conviction pursuant to TENN CODE ANN. § 39–14–121 nor may it pursue damages under the Collection of Bad Checks Act found at TENN. CODE ANN. § 47–29–101, et seq.

tained herein will be binding upon Cash in a Flash Check Advance.

Upon presentment of the customer's check for collection, if said check is not payable for any reason whatsoever, this matter shall be placed with an attorney for collection of any and all monied due and owing Cash in a Flash Check Advance all reasonable and necessary costs and expenses of collection, specifically included, but not limited to reasonable attorney fees and other damages as set forth in Tenn.Code Ann. 47–29–101.

Customer agrees, certifies, and warrants that said check will be paid upon presentment to the financial institution upon which said check is drawn after 14 days from the date thereon.

Customer agrees that notice of dishonor of customer's check shall be considered as having been given at the time said notice was deposited in the regular United States mail at the address printed on the check or at the address given by the customer in writing to Cash in a Flash Check Advance. **THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT HE OR SHE HAS READ AND FULLY UNDERSTANDS THE TERMS AND CONDITIONS OF THE ABOVE AGREEMENT. THE UNDERSIGNED HEREBY AGREES THAT BY SIGNING THIS DOCUMENT HE OR SHE BECOMES A PARTY TO SAID AGREEMENT AND HEREBY AGREES TO BE BOUND BY ALL TERMS, CONDITIONS AND OBLIGATIONS CONTAINED THEREIN.**

Brown Trial Exhibit 1.

On July 28, 1997, Ms. Brown filed a voluntary Chapter 13 petition. She listed Cash in a Flash on Schedule F–Creditors Holding Unsecured Nonpriority Claims as an unsecured creditor holding a claim in the amount of $442.00. The plan filed with the debtor's petition treated the claim of Cash in a Flash as a general unsecured claim to be repaid a percentage of its claim as determined by the Chapter 13 trustee upon the expiration of the 90 day bar date for filing proofs of claim. Cash in a Flash filed a proof of claim in the amount of $1,593.33. On September 3, 1997,

Cash in a Flash filed an objection to confirmation of Ms. Brown's plan on the basis that "the debtors' proposed plan does not comply with the provisions of 11 U.S.C. Sections 361, 362, 365, 1301, 1325, and 109." Mr. Lynn and Mr. Bursi submitted a proposed "Consent Order Withdrawing Objection to Confirmation of Cash in a Flash" on or about October 14, 1997, whereby the parties sought to modify the debtor's plan "to transfer a portion of the claim of Cash in a Flash, in the amount of $445.00, to Class I, unsecured status, to be paid at the rate of $10.00 per month, with the balance of the claim, if any, to be paid as a general, unsecured creditor—based on the debtor's issuance to said creditor of two worthless checks within 90 days prior to the filing of the instant petition herein."

### C. Adam B. Chandler

Adam B. Chandler did not appear at the scheduled hearing, but was represented by Melinda Benham, attorney. Chandler also obtained deferred presentment services from Cash in a Flash. Ms. Clark, the Collection Manager, testified that Mr. Chandler's first transaction with Cash in a Flash occurred on April 29, 1997. He last issued a check payable to Cash in a Flash on May 31, 1997, in the amount of $238.00. According to Ms. Clark, Mr. Chandler delivered four checks to Cash in a Flash during the period from April 29 through May 31, 1997.

On August 6, 1997, Mr. Chandler filed a voluntary Chapter 13 petition. He listed Cash in a Flash on Schedule F—Creditors Holding Unsecured Nonpriority Claims as an unsecured creditor holding a claim in the amount of $165.00. The plan filed with the debtor's petition treated the claim of Cash in a Flash as a general unsecured claim to be repaid 100% of its claim over approximately 60 months. Cash in a Flash filed a proof of claim in the amount of $817.33. On September 10, 1997, Cash in a Flash filed an objection to confirmation of Mr. Chandler's plan on the basis that "the debtors' proposed plan does not comply with the provisions of 11 U.S.C. Sections 361, 362, 365, 1301, 1325, and 109." Ms. Benham and Mr. Bursi submitted a proposed "Consent Order Withdrawing Objection to Confirmation of Cash in a Flash"

on or about November 17, 1997, whereby the parties sought to modify the debtor's plan to create a special class of unsecured creditor for treatment of the claim of Cash in a Flash, in the amount of $238.00, to be paid at the rate of $10.00 per month.

## D. Joy Zella Echols

Joy Zella Echols did appear at the scheduled hearing together with her attorney, Sidney Feuerstein. Ms. Clark testified that Ms. Echols had three accounts with Cash in a Flash at three separate locations. Ms. Echols first began doing business with Cash in a Flash in March 1997. Over a period of time, she wrote ten checks made payable to each store, for a total of thirty checks. The last three checks were each made payable to Cash in a Flash in the amount of $238.00. Two were dated July 28, 1997; and the third was dated August 1, 1997. Ms. Echols filed a voluntary Chapter 13 petition on August 21, 1997.

Ms. Echols explained that she learned about Cash in a Flash from a mail flyer which advertised that Cash in a Flash would cash a personal check and hold the check for 14 days. Ms. Echols brought her most recent bank statement, a recent paycheck stub and driver's license to the Cash in a Flash location on Madison Avenue. When she entered into her first transaction at each of the Cash in a Flash locations, Ms. Echols signed a document identical to that signed by Ms. Brown.

Each time Ms. Echols faced a fourteen-day deadline with respect to a check she had written to Cash in a Flash, she brought $238.00 cash to the store to redeem her check. Each time she delivered a new check for $238.00 to Cash in a Flash and walked out with $200.00 cash.

Ms. Echols testified that she initially used the services of Cash in a Flash because she needed to make some repairs to her car. Later she said her roommate moved out causing her to pay all of certain obligations that were formerly shared with her roommate. Ms. Echols first contacted Mr. Feuerstein about filing her bankruptcy petition in early August 1997. At that time, in addition to having three obligations outstanding to Cash in a Flash, Ms. Echols was also obligated to other deferred presentment service providers, including Central Cash Advance, USA Cash, Cash 2 U Leasing, and Arrow Financial. Ms. Echols admitted that she was in financial distress when she received the last "advances" from Cash in a Flash on July 28 and August 1, 1997.

Ms. Echols listed each of the three Cash in a Flash locations with which she had done business on Schedule F—Creditors Holding Unsecured Nonpriority Claims. The amount of each claim listed was $238.00. Ms. Echols's plan proposed to pay general unsecured creditors a percentage of their claims to be determined by the trustee. Cash in a Flash filed a proof of claim in the amount of $2,451.99. On September 10, 1997, Cash in a Flash filed an objection to confirmation of Mr. Echols's plan on the basis that "the debtors' proposed plan does not comply with the provisions of 11 U.S.C. Sections 361, 362, 365, 1301, 1325, and 109." Mr. Feuerstein and Mr. Bursi submitted a proposed "Consent Order Withdrawing Objection to Confirmation of Cash in a Flash" on or about October 24, 1997, whereby the parties sought to modify the debtor's plan to create a special class of unsecured creditor for treatment of a portion of the claims of Cash in a Flash, in the amount of $714.00, to be paid at the rate of $12.00 per month, "with the balance of the claim, if any, to be paid as a general, unsecured creditor—based on debtor's issuance to said creditor of three worthless checks within 90 days prior to the filing of the instant petition herein."

## E. Deferred Presentment Services

Mr. Dwight Blake described the operation of Cash in a Flash. He testified that he is a part owner of six out of a total of eight Cash in a Flash locations in the Memphis area and that he manages all eight. He has been an owner in this business since January 1997 but has twenty-seven years of experience in the finance business. He participated in the drafting of Tennessee's Deferred Presentment Services Act, Tennessee Code Annotated section 45–17–101 *et seq.*, which became effective October 1, 1997, and thus does not apply to the transactions under consideration here.

Mr. Blake testified that the service his company provides is not considered a loan. Rather, Cash in a Flash provides a check cashing service. Mr. Blake testified that if a customer's check is not redeemed as agreed, the check is deposited. Cash in a Flash does not permit "rollovers"; that is, it does not permit its customer to merely pay a fee to have the company hold his or her check another fourteen days.

Mr. Blake testified that some customers use the services of Cash in a Flash to avoid high returned check charges. As an example, he said that a bank might charge $20.00 for an NSF check, and would typically receive the same check for payment twice before it is returned to the customer. In addition, vendors often charge an additional fee of $15.00. Thus, a customer could face charges of as much as $55.00 on a returned check. By way of contrast, Cash in a Flash charged a $38.00 fee for a fourteen-day advance of $200.00 until October 1, 1997. Now Cash in a Flash is limited by statute to charging the lesser of 15% of the face amount of the check or $30.00. TENN.CODE ANN. § 45–17–112(b). Mr. Blake testified that other customers use the services of Cash in a Flash because the location is more convenient than their bank. Mr. Blake further noted that banks typically will not make a loan for less than $500.00, and that the approval process for a small loan may take one day to one week. The largest advance made by Cash in a Flash prior to October 1, 1997, was $200.00, and the approval process was a matter of minutes, not days. Thus, Mr. Blake claimed that his business and others like it fill the needs of a niche market not being served by banks.

Prior to the effectiveness of the Deferred Presentment Services Act, the fees charged by Cash in a Flash were posted in each store but were not included in the agreement signed by a customer. For a $200.00 advance, Cash in a Flash charged a fee of $38.00. Thus, upon approval, a Cash in a Flash customer would write a check for $238.00 and receive cash in the amount of $200.00. To redeem the check at the end of the fourteen-day holding period, the customer was required to bring in $238.00 cash.

Ms. Melinda Thompson testified concerning the operation of EZ Cash. Ms. Thompson is a part owner of certain EZ Cash locations. The business of EZ Cash is similar to that of Cash in a Flash. Prior to October 1, 1997, EZ Cash charged a fee of $48.00 for an advance of $200.00. Unlike Cash in a Flash, EZ Cash did permit "rollovers." In certain instances, EZ Cash would require its customers to leave a new check at the time of renewal, but did not require its customer to pay the entire obligation in full. The customer was required only to pay a "renewal fee" ($48.00 for a $200.00 advance) to obtain an extension of fourteen days.

Ms. Thompson testified that for accounting purposes, EZ Cash recognizes income of $248.00 when it receives a customer's check. The $200.00 advanced by EZ Cash is treated as a "cost of goods sold." When a customer files a bankruptcy petition, the customer's account is written off as a bad debt.

### ISSUES PRESENTED

1. Whether the claims of deferred presentment service providers are secured or unsecured.

2. Whether the separate classification and treatment of the claims of deferred presentment service providers is permissible under 11 U.S.C. §§ 1322(a)(3) and (b)(1).

3. Whether the debtors' plans have been proposed in good faith.

### CONCLUSIONS OF LAW
#### A. Secured Status

On behalf of EZ Cash, Mr. Gotten argues that the claim of a deferred presentment service provider is actually a secured claim, with the underlying obligation to pay being secured by possession of a negotiable instrument, the customer's check. EZ Cash has offered no authority for its position.

The Court has found only two reported cases which discuss the type of service offered by EZ Cash and Cash in a Flash. In *State of Mississippi v. Roderick*, 704 So.2d 49 (Miss.1997), the Mississippi Supreme Court affirmed the dismissal of an indictment of a check cashing business for allegedly

collecting unlawful debts in violation of the state RICO Act. The business of the defendant, named "We Cash It," was identical to that of EZ Cash and Cash in a Flash. The defendant argued that he was not in the business of making loans, but was cashing checks in exchange for a one-time fee. *Id.* at 53. The Mississippi Supreme Court accepted this characterization of the transaction, but stated that even when a negotiable instrument is purchased at a discount, the discount is still limited to the interest limit set by Mississippi law. *Id.* (citing *Bell v. Tindall,* 215 Miss. 343, 60 So.2d 801, 804 (1952) and *Evans v. National Bank of Savannah,* 251 U.S. 108, 113–14, 40 S.Ct. 58, 59–60, 64 L.Ed. 171 (1919)).

In *Miller v. HLT Check Exchange (In re Miller),* 215 B.R. 970 (Bankr.E.D.Ky.1997), the debtor/plaintiff alleged that the defendant's check cashing business violated federal and state consumer credit disclosure violations, state usury laws, and consumer protection laws. In that case, the customer was charged a service charge when she first cashed her check which was to be held by the defendant for two weeks and an identical fee to renew the transaction if the customer was unable to redeem her check. The defendant check casing service in *Miller* argued that it was not extending credit and thus that the complaint should be dismissed. Characterizing the defendant's claim that it was not extending credit as "disingenuous," the court said, "They [the check cashing services] are disbursing funds to people like the plaintiff on the promise of repayment of the sum plus the 'service charge,' at a later time. If this is not an extension of credit, this court finds it hard to imagine any transaction that is." *Id.* at 974.

This Court agrees that the transactions which are at issue in these cases present more than the mere cashing of checks. When a check is cashed at a bank or grocery store, there is no separate agreement whereby the check is held for a specified period of time during which the drawer may redeem the check. The transaction contemplated clearly is a short-term extension of credit.

The Court is not persuaded, however, that the transactions create secured obligations.

While it is clear that a negotiable instrument may be taken as security for an obligation (*see* TENN. CODE ANN. § 47–9–305), a negotiable instrument cannot serve as security for the very obligation it is intended to pay. "Collateral" literally means "by the side." BLACK'S LAW DICTIONARY 261 (6th ed.1990). "Collateral is additional security for performance of principal obligation, or that which is by the side, and not in direct line." *Id.*

■ In these cases, loans were made by EZ Cash and Cash in a Flash. Their respective customers agreed to repay the loans together with a service charge within fourteen days. The customer's check was the method of repayment. If a customer's check is dishonored, a deferred presentment services provider can maintain an action on either the check or the underlying obligation (TENN. CODE ANN. § 47–3–502(b)), but it is entitled to only one satisfaction. If the check is honored, discharge of the customer on the instrument also discharges him on the obligation. *Id.* Conversely, if the customer discharges the underlying obligation (*i.e.,* if he "redeems" the check by paying cash), he is entitled to have the instrument returned to him (*i.e.,* he is discharged on the instrument). The check has no value independent of the underlying obligation. It does not "stand beside" the underlying obligation or provide additional security for the performance of the underlying obligation. The Court holds that the obligations to EZ Cash and Cash in a Flash are not secured.

## B. Separate Classification

In each of these cases, the debtor originally proposed to treat the claims of the deferred presentment service providers as general unsecured claims. In each case, after an objection to confirmation was filed, the debtor proposed to modify his or her plan by separately classifying and treating the claim of the deferred presentment service provider. Rather than receiving a pro rata distribution with other general unsecured creditors, these creditors were to receive 100% of their entire claim or a specified portion of their claim, to

be paid in regular monthly installments. According to George W. Stevenson, one of the standing Chapter 13 trustees for this district, those claims which are classified as "Class I, unsecured" are paid in full before general unsecured creditors receive any distribution.

Pursuant to 11 U.S.C. § 1323(a), "the debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of section 1322 [of title 11]." Bankruptcy Code section 1322(b)(1) governs the classification of unsecured claims in a Chapter 13 case. It provides in pertinent part:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> (1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated. . . .

■ It is the burden of the debtor, as proponent of the Chapter 13 plan, to prove that the proposed classification does not discriminate unfairly. *In re Groves*, 39 F.3d 212, 214 (8th Cir.1994); *In re Kolbe*, 199 B.R. 569, 570–71 (Bankr.D.Md.1996). The debtors in these cases have articulated little justification for the separate classification and treatment of the claims of the deferred presentment service providers. Counsel for one indicated that the agreement for separate classification resulted from the debtor's fear of criminal prosecution. Counsel for another indicated that the agreement was reached to avoid the expense of litigating the question of whether the claim was secured. On behalf of Cash in a Flash, Mr. Bursi strongly urged that the proximity of the transactions to the filing of the debtors' bankruptcy petitions indicated a lack of good faith on the part of each debtor in proposing his or her plan and that the proposed separate classification was intended to avoid the litigation of that issue. While the Court always encourages settlement where possible, the proposed settlement may not result in a plan that is not capable of confirmation.

■ The Court notes with approval the comments of Bankruptcy Judge Barbara Sellers concerning the separate classification of claims in Chapter 13 cases:

> Any classification of unsecured claims must pass a test of fairness unless that classification involves consumer debts for which co-signers were obtained. *See Nelson v. Easley (In re Easley)*, 72 B.R. 948, 956 (Bankr.M.D.Tenn.1987). Unlike Chapter 11, unsecured creditors in Chapter 13 are not afforded an opportunity to vote. Further, unless their claims are unusually large, such creditors generally lack economic incentive to object to confirmation of a low dividend plan. Therefore, the primary burden for scrutinizing the differing treatment of separately classified unsecured claims in Chapter 13 falls, first on the Chapter 13 trustee, and then on the court.

*In re Riggel*, 142 B.R. 199, 202 (Bankr. S.D.Ohio 1992).

■ In general, four factors must be considered in determining whether a proposed classification scheme is proper:

1. Whether the discrimination has a reasonable basis;
2. Whether the debtor can carry out the plan without such discrimination;
3. Whether the classification has been proposed in good faith; and
4. The nature of the treatment of the class discriminated against.

*In re Riggel*, 142 B.R. at 202 (citing *In re Hosler*, 12 B.R. 395, 396 (Bankr.S.D.Ohio 1981)); see 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 4.61, p. 4–132 (2d ed.1994) and cases cited at n. 471 (hereinafter "LUNDIN").

As the Court has ruled that the claim of EZ Cash is not secured, the settlement of that question cannot support a separate classification and treatment of the EZ Cash claim in the case of Mary Brigance. In the proposed order submitted in the Brigance case, a second justification for the separate classification and treatment was offered, that the claim was incurred within forty-five days preceding the filing of the bankruptcy petition. The Court understands this as an argument that the debtor's plan was not proposed in good faith. Cash in a Flash, on the

other hand, does not take the position that the obligations to it are secured, but rather that the proximity of the transactions to the filing of the bankruptcy petitions, together with other facts about the debtors, indicates that the plans were not proposed in good faith. In addition, in Mr. Bursi's proposed orders, the assertion is made that the separate classification and treatment is based upon the debtors' issuance of worthless checks.

The Court has located four cases that address the question of whether it is appropriate to separately classify and preferentially treat claims for debts arising from insufficient funds checks. Each of these cases concludes that it is not. *See In re Hiner*, 161 B.R. 688, 689 (Bankr.D.Idaho 1993) (discrimination between unsecured creditors to whom the debtor delivered insufficient funds checks and other creditors who were not delivered insufficient funds checks is not authorized by statute and is not fair discrimination); *In re Riggel*, 142 B.R. 199, 204 (Bankr. S.D.Ohio 1992) (no reasonable basis exists for separate classification and preferential treatment of claims for debts arising from checks returned for insufficient payment); *In re Stanley*, 82 B.R. 858, 859 (Bankr. S.D.Ohio 1987) (absent pending criminal action or conviction, the proposed classification unfairly discriminates against other unsecured claimants which also extended credit to debtors and remain unpaid); *In re Gay*, 3 B.R. 336 (Bankr.D.Colo.1980) (plan that proposed to pay holders of returned checks in full while paying all other unsecured creditors two percent of their claims was unfairly discriminatory). The issuance of "worthless checks" does not provide a reasonable basis for separate classification and preferential treatment of the resulting claims.

Although not expressed as such, the Court believes that underlying the arguments raised by counsel is the assertion that these claims may be separately classified in Chapter 13 because they could be found to be nondischargeable in Chapter 7. Cash in a Flash asserts, for example, that "knowingly taking money or services within less than a week of signing a bankruptcy petition is in this situation fraudulent if not criminal." It is not at all clear that these claims would be nondischargeable in Chapter 7,[3] but assuming for the sake of argument that they were, that fact alone would not create a reasonable basis for preferential treatment of these claims over those of other unsecured creditors. *In re Riggel*, 142 B.R. at 203. If these claims were non-dischargeable under Chapter 7, it could only be on the basis of section 523(a)(2)(A), which excepts from discharge claims based upon money, property, services, or an extension, renewal, or refinancing of credit, obtained by false pretenses, a false representation or actual fraud. Significantly, section 523(a)(2)(A) debts are dischargeable in Chapter 13. *See* 11 U.S.C. § 1328(a). In Chapter 13, section 523(a)(2)(A) debts are indistinguishable from other dischargeable debts, and thus cannot provide a reasonable basis for separate classification and preferential treatment. *See In re Riggel*, 142 B.R. at 203; *see also* LUNDIN, §§ 4.67 and 4.70.

### C. Good Faith

▇▇ EZ Cash and Cash in a Flash argue that separate classification and preferential treatment of their claims is appropriate because the debtors' plans were not proposed in good faith. Bankruptcy Code section 1325(a)(3) requires the court to confirm a plan if "the plan has been proposed in good faith and not by any means forbidden by law." The determination of whether a plan

---

**3.** In these cases, none of the checks which is at issue has actually been presented for payment, so they have not been returned due to insufficient funds. Even if they had, the delivery of a check drawn on insufficient funds is not evidence of fraud per se. *In re Nahas*, 92 B.R. 726, 728 (Bankr.E.D.Mich.1988). For purposes of Bankruptcy Code section 523(a)(2)(A), it is said that " '[a]ctual fraud involves moral turpitude and does not include fraud implied in law which may exist without imputation of bad faith or intentional wrong.' " *In re Anderson*, 181 B.R. 943, 948 (Bankr.D.Minn.1995) (quoting *In re Pommerer*, 10 B.R. 935, 939 (Bankr.D.Minn.1981)). Fraud imputed by a statutory provision, such as that concerning insufficient funds checks, is not sufficient to establish nondischargeability. *Anderson*, 181 B.R. at 948. The burden of proof to establish the nondischargeability of a particular debt rests with the plaintiff. *Atassi v. McLaren (In re McLaren)*, 990 F.2d 850, 853 (6th Cir.1993)(citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

has been proposed in good faith "requires the use of discretion by the bankruptcy judge." *In re Okoreeh–Baah,* 836 F.2d 1030, 1033 (6th Cir.1988). In the Sixth Circuit, the bankruptcy judge "must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources." *Id.* The debtor's pre-petition conduct is but one element in this determination based upon the "totality of circumstances confronting the debtor." *Id.*

■ It would be odd if the solution to a plan not proposed in good faith were to preferentially treat the objecting creditor to the detriment of other unsecured creditors. This seems akin to "buying a discharge" in a Chapter 7 case by agreeing to reaffirm the debt of a creditor who objects to the debtor's discharge pursuant to section 727(a). Because the Court has determined that there is no reasonable basis for separately classifying and preferentially treating the claims of EZ Cash and Cash in a Flash, the determination of whether the debtors' plans have been proposed in good faith must focus on the proposed treatment of all unsecured creditors, not simply the treatment of the claims of the objecting creditors. Good faith does not require the repayment of specific types or percentages of claims. *In re Johnson,* 69 B.R. 726, 729 (Bankr.W.D.N.Y.1987).

### 1. Mary Brigance

■ Turning to the individual cases, in the *Brigance* case, the only allegation relating to good faith is that the debt was incurred within 45 days of the filing of the petition. Ms. Brigance lists net income of $774 per month and expenses of $960 per month. (No objection was raised based upon the feasibility of the debtor's plan, and the Court will not address that issue here.) The confirmed plan requires payment of $105 every two weeks to be paid by payroll deduc-

tion. The debtor has agreed to pay more than her apparent disposable income to the funding of the plan for a period of 60 months rather than the 36 months required by 11 U.S.C. § 1325(b)(1)(B).[4] The percentage to be paid to unsecured creditors has not yet been determined, but this is not a case in which the debtor proposes to "sharply compose" the claims of unsecured creditors. *See In re Riggel,* 142 B.R. 199, 203 (Bankr. S.D.Ohio 1992). The debtor lists no prior bankruptcy cases within the last six years on her petition. The court finds that the *Brigance* plan was proposed in good faith.

### 2. Kisha Lavae Brown

■ With respect to Ms. Brown, it appears that the debtor's first transaction with Cash in a Flash occurred on or about April 11, 1997. Ms. Brown's Chapter 13 petition was not filed until July 28, 1997. Cash in a Flash alleges as evidence of the debtor's lack of good faith that the debtor failed to appear at the scheduled hearing and that the percentage to be paid to unsecured creditors is approximately 12% on unsecured claims of approximately $5,600.00. Further, Cash in a Flash alleges that the debtor incurred liabilities to three other deferred presentment service providers within 90 to 120 days prior to the bankruptcy petition filing.

While Cash in a Flash places great emphasis on the proximity of its transactions with the debtor to the filing of the debtor's petition, the Court notes that the very nature of the business of Cash in a Flash dictates that if one of its customers files a bankruptcy petition, it will occur within a relatively short time after the transaction. Cash in a Flash is in the business of making short-term loans and charging rather high (though now, unfortunately, legal) fees for its services. It cannot be heard to complain that the use of its services by a financially distressed person is tantamount to bad faith. Ms. Brown lists net monthly income of $1,151.67 and monthly

---

4. (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

    (B) the plan provides that all of the debtor's projected disposable income to be received in

the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1)(B).

expenses of $919.00. Ms. Brown is a single mother of two children. None of her listed expenses appear extravagant. Ms. Brown's plan calls for the payment of $83.00 weekly by payroll deduction for 60 months. The debtor proposes to devote more than her apparent disposable income to the plan. The Court finds that the *Brown* plan was proposed in good faith.

### 3. Adam B. Chandler

■ With respect to Mr. Chandler, it appears that the debtor's first transaction with Cash in a Flash occurred on or about March 29, 1997, and the debtor's Chapter 13 petition was filed August 6, 1997. The check at issue in Mr. Chandler's case is dated May 31, 1997, more than 60 days prior to the petition date. Cash in a Flash alleges that the debtor's failure to appear at the scheduled hearing and failure to list his prior Chapter 7 case, number 95–28011, and prior Chapter 13 case, number 96–26256, are indications that Mr. Chandler's plan was proposed in bad faith. Cash in a Flash further alleges that the debtor incurred debts to four other deferred presentment service providers within 90 to 120 days prior to the petition date.

The debtor proposes to pay 100% of his unsecured creditors in the estimated amount of $3,808.00 over a period of approximately 60 months.

While the Court does not condone the debtor's failing to list his prior bankruptcy cases on his petition in this case, that factor alone does not indicate that the debtor's plan was not proposed in good faith. It does not appear that the debtor affirmatively stated that there were no prior bankruptcy cases filed by him in the prior six years, but rather that the debtor failed to answer that question. Further, Cash in a Flash cannot have been prejudiced by any prior filing, because it was not a creditor of the debtor until March 29, 1997. The Court finds that Mr. Chandler's plan, which proposes to pay 100% of the unsecured claims, was proposed in good faith.

### 4. Joy Zella Echols

■ With respect to Ms. Echols, it appears that the debtor's first transaction with Cash in a Flash occurred on or about March 28, 1997, and that her Chapter 13 petition was filed August 21, 1997. Although Cash in a Flash denies that it permits rollovers, in effect Ms. Echols renewed each of her initial three loans ten times, with the last checks being delivered on July 28 and August 1, 1997.

In addition to the proximity of the final transaction with Cash in a Flash to the filing of the petition, Cash in a Flash points to the following as indications of the debtor's lack of good faith in proposing her plan:

a. The debtor incurred a debt to Central Check Advance on July 30, 1997, which was repaid on August 22, 1997, after the filing of her petition;

b. The debtor testified that she knew she was in financial distress when she gave the final three checks to Cash in a Flash;

c. The debtor obtained advances from seven other finance companies and/or deferred presentment service providers within 90 to 120 days prior to the filing of her petition.

A review of the debtor's file reveals that she has net monthly income of $1,420.00 and monthly expenses of $1,331.00. She proposes to pay $138.00 every two weeks for approximately 60 months to fund her plan. The percentage to be paid to unsecured creditors has not yet been determined, but it is clear that the debtor proposes to devote more than her apparent disposable income to the plan.

The debtor satisfactorily explained that she initially needed the advance from Cash in a Flash to pay for car repairs and later experienced serious financial problems when her roommate moved out. Although Cash in a Flash would prefer that the Court look at the delivery of the final three checks by the debtor in isolation, the Court will not ignore the prior course of dealing between the parties. The only funds made available to the debtor as a result of these transactions was $600.00. The fees paid by Ms. Echols can be calculated. The debtor executed a total of 30 checks to Cash in a Flash. The debtor paid a fee of $38.00 per transaction, excluding the last three which have not been paid. Thus for the $600.00 which was advanced by Cash

**498**

in a Flash, the debtor has paid service charges of $1,026.00 [27 × $38.00]. The court further notes that Cash in a Flash has filed an unsupported proof of claim in this case in the amount of $2,451.99.[5]  The Court finds that Ms. Echols' plan has been proposed in good faith.

### CONCLUSION

For the foregoing reasons, this Court holds that the obligations to EZ Cash and Cash in a Flash are not secured.  Further, the Court concludes that EZ Cash and Cash in a Flash did not provide a reasonable basis for separate classification and preferential treatment.  Thus, the Court holds that the claims shall be treated as general unsecured claims.  Finally, the Court holds that the plans submitted by all four debtors were submitted in good faith.  As a result, the proposed settlements in each case are not approved by this Court.

Separate orders will be entered in each case commensurate with this opinion.

**5.** Witnesses for Cash in a Flash could not explain     why the claim exceeded $714.00 [3 × $238.00].